Estate of William S. Cherry, Rhode Island Hospital Trust Company, et al., Executors v. Commissioner.
Estate of William S. Cherry, Rhode Island Hosp. Trust Co., v. Commissioner
Docket No. 7310.
United States Tax Court
1946 Tax Ct. Memo LEXIS 166; 5 T.C.M. (CCH) 495; T.C.M. (RIA) 46140; June 13, 1946
*166 1. The decedent transferred certain securities to his two children within two years of his suicidal death. Held, the transfers were not made in contemplation of death within section 811(c) of the Internal Revenue Code. 2. Fair market values of certain securities as of optional valuation date ascertained. 3. Deduction for a debt in the amount of $2,500 claimed by executors and allowed by the respondent is sustained on the failure of respondent to show error in his original determination. Harold B. Tanner, Esq., for the petitioners. Carl A. Stutsman, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion This proceeding involves a deficiency in estate tax. In his deficiency notice *167 the respondent determined a deficiency of $445,356.14, and by his first amended answer increased the claimed deficiency to $457,082.19. By a second amendment to the answer to conform to proof, the respondent seeks the disallowance of an item of $2,500 as a debt of the estate previously allowed. The petitioners claim that there has been an overpayment of $33,099.48. The several issues raised are as follows: (1) Whether certain gifts by the decedent to his children were made in contemplation of death. (2) What is the fair market value at the optional valuation date of certain stocks owned by the decedent at his death? (3) Whether the sum of $2,500 claimed and allowed was a proper deduction from the gross estate. Some of the facts have been stipulated and, as stipulated, they are incorporated herein by reference. Findings of Fact The petitioners herein are the duly qualified executors under the will of the late William S. Cherry who died testate on March 29, 1941, a resident of the State of Rhode Island. The estate tax return was filed with the collector of internal revenue at Providence, Rhode Island. The executors have elected to value the estate as of the optional valuation *168 date, March 29, 1942. The sum of $305,556.37 was paid on account of the estate tax on the decedent's property on June 29, 1942. William S. Cherry, the decedent, was born November 14, 1867, in Canada. For many years prior to his death on March 29, 1941, at the age of 74, by suicide, he had been a successful merchant. In about 1894, the decedent together with one Frederick Webb, now deceased, started a retail store business at Fall River under the name of Cherry & Webb. They dealt, for the most part, in ladies' wearing apparel. In the course of time they became the owners and operators of other similar stores in and around Rhode Island, and they were associated in other business interests. Contemplation of Death Issue Within a period of two years immediately preceding his death the decedent made the following transfers of property to his two children: Donee
Date
Property
Anna Cherry Gross
Nov. 6, 1939
536 shares
Cherry & Webb, Lowell,
common stock
Anna Cherry Gross
Nov. 6, 1939
100 shares
Putnam Land & Mills stock
William S. Cherry, Jr.
Nov. 6, 1939
490 shares
Cherry & Webb, Lowell,
common stock
Anna Cherry Gross
Nov. 17, 1939
25 shares
Cherry & Webb
Broadcasting Co. stock
William S. Cherry, Jr.
Nov. 17, 1939
25 shares
Cherry & Webb
Broadcasting Co. stock
Anna Cherry Gross
Apr. 30, 1940
Rosedale Realty Bonds
William S. Cherry, Jr.
Apr. 30, 1940
Rosedale Realty Bonds
*169 In addition, he transferred 2,500 shares of East Malartic Gold Mine stock to his daughter, Anna Cherry Gross, on January 25, 1939. Under the terms of the will left by decedent, a substantial part of the property owned by him at his death was left to his two children in equal shares. The will did, however, provide for a number of small cash gifts ranging from $1,000 to $5,000 for some of his friends, business associates and relatives, and provided other larger gifts for certain charities. The decedent was a large, robust individual. He liked the out-of-doors, took many trips, played golf frequently and appeared well and hearty. In 1937, he slipped on the stairs in his home and a little later complained of a pain in his back. He visited certain doctors and submitted to an operation for the removal of one of his kidneys which appeared to have been damaged by the fall. The decedent completely recovered from the operation. He did some work in connection with his business interests while still in the hospital and after his release he carried on as usual at his place of business. The decedent was not sick or under the care of doctors before or after his operation except with respect *170 to his mental condition hereinafter referred to. In 1938 a house owned by the decedent was severely damaged by a hurricane. In 1939 he commenced replacing the house with an apartment building. He was very much interested in the project, spent considerable time supervising its erection, and he personally selected the fittings and equipment. He was interested in building a restaurant for the Howard Johnson system and spent some time and money for surveys in connection with the proposal. His wife died in 1930. Thereafter, for a part of the time his son and his son's family lived in the decedent's house with him. Later the son moved into his own home and the decedent resided alone. He was close to his children and visited them often. In 1940 the decedent contemplated marrying his housekeeper, but such marriage did not take place due in part to the fact that his children were very much opposed to it, and to religious differences. Between 1937 and October 1940, the decedent was examined by a doctor but once. That was the customary check-up after the kidney operation. Toward the end of 1940 he became mentally upset and was somewhat apprehensive. His doctor could find no physical cause *171 for the anxiety and nervousness affecting him, and a neuro-psychiatrist was called in. After the examinations the decedent was advised to go on a vacation. Accordingly, he, along with his son, a friend and a valet, went to Florida where they spent five or six weeks relaxing and playing golf. He seemed to have compete control of himself. At that time he talked of taking a world cruise when travel of that nature again became possible. After his return from Florida and on March 29, 1941, the decedent flung himself from the fifth floor of a mental hospital where he had been under observation by his doctor. The decedent's son and daughter worked at business matters pertaining to their father's various stockholdings. With the exception of the Rosedale Realty bonds which the parties have agreed were worth face value or $200,000 to each donee and the Broadcasting Company stock, the gifts made by the decedent to his children had no particular value. The gift of the Lowell store common stock was made because that store had long been troublesome and he thought that by giving his son and daughter that stock they would be more interested in it and would devote more time to it. That store *172 needed much more attention than any of the others. He considered the gifts of the Rosedale Realty Company bonds for a long time before making the gifts. Frequently he found it necessary to assist his children financially and as a means of so doing he determined to give them the bonds. The son had worked for his father since 1924. Both of the decedent's children were married and had families. None of the gifts were testamentary in character and none of them were made in contemplation of death. They were made for the purpose of helping the children along financially and to keep them interested in the decedent's business activities. Value of Securities in Decedent's Estate Included in the decedent's gross estate were shares of stock in various companies and in the quantities indicated below: No. of
Type of
Stock
Shares
Name of Company
Location
Stock
Outstanding
935
Cherry & Co., Inc.
New Bedford
preferred
3,000
818
Cherry & Co., Inc.
New Bedford
common
2,700
437
Cherry & Webb Co.
Fall River
preferred
1,250
788
Cherry & Webb Co.
Fall River
common
2,250
500
Cherry & Webb Co.
Lawrence
preferred
1,000
600
Cherry & Webb Co.
Lawrence
common
1,210
1,106
Cherry & Webb Co.
Lowell
preferred
2,000
5
Cherry & Webb Co.
Lowell
common
2,070
1,125
Cherry & Webb Co.
Providence
preferred
2,250
1,993
Cherry & Webb Co.
Providence
common
7,587
16
Cherry Realty Co.
capital
51
5,159
Cherry & Webb Realty Co.
capital
11,450
54
Cherry & Webb Broadcasting Co.
capital
400
*173 With respect to most of the stocks the respondent has taken the position that the values are in excess of the values reported by the petitioners. On three of the stocks, two preferred and one common, the parties are in substantial agreement. There are no known sales or bid and asked prices for any of the shares here involved on March 29, 1942. None of them was listed on any stock exchange. All of the stocks in the respective companies were closely held. On March 10, 1943, the Cherry & Webb Co. of Providence purchased from the estate of Frederick Webb securities of some of the above companies, as follows: 5 shares Cherry & Webb Company, Lawrence, common at $88.00 per share 5 shares Cherry & Webb Company, Lowell, common at $5.00 per share 5 shares Cherry & Company, Inc., New Bedford, common at $50.00 per share 5 shares Cherry & Webb Company, Fall River, common at $97.50 per share 363 shares Cherry & Webb Company, Providence, common at $97.50 per share Nearly all of the stock certificates in question carried a provision to the effect that no holder thereof should transfer his stock without first offering it to the corporation at the lowest price at which he would be *174 willing to sell. Cherry & Co., Inc., New Bedford, had outstanding 3,000 shares eight per cent cumulative preferred stock, callable at any time at $105 per share, and 2,700 shares of common stock. In 1941 the company had capital of about $671,000, of which $300,000 was in preferred stock. Total capital had steadily increased from about $419,000 in 1932. In 1941 the ratio of current assets to current liabilities was about 3 1/3 to 1. Sales in 1941 totaled some $1,980,000, showing a steady increase from $1,050,000 in 1932. Operating income increased from $8,089 in 1932 to about $179,000 in 1941. The preferred dividend requirement for all years was $24,000. The corporation has paid no common stock dividends up to and including 1941, but since 1936 it has paid preferred dividends in substantial amounts. As of January 31, 1942, arrearage in preferred dividends amounted to $12,000. The company earned 3.96 times the preferred dividend in 1941 as compared to 0.45 times in 1932. Book value of the common shares as of 1941 was about $133. Average earnings (corrected) per common share during the 3-year period 1939 to 1941 was $20.48; during the 6-year period 1936 to 1941, $15.66; and during the *175 10-year period 1932 to 1941, $10.63. The petitioners reported the common stock at $40 per share and the preferred at $94. The respondent determined values of $200 for common and $106 for preferred, and now contends for values of $157 and $105 per share, respectively. Cherry & Webb Co., Fall River, had outstanding 1,250 shares eight per cent cumulative preferred stock callable at $105, and 2,250 shares of common stock. In 1941 this company had a total capital of about $517,000 which had steadily increased from a total of about $335,000 in 1932. In 1941, the ratio of current assets to current liabilities was 2 1/2 to 1. Total sales in 1941 amounted to some $1,645,000 reflecting a steady increase over sales of about $812,000 in 1932. Operating income for 1932 was a deficit of $12,662, but it increased gradually to about $110,000 in 1940 and jumped to a little over $200,000 in 1941. The preferred dividend requirement was $15,000 in the earlier years on a total preferred stock of $187,500, and in 1935 and thereafter was $10,000 on preferred stock of $125,000. In 1941 common stock and surplus amounted to $392,000. The company paid no dividends on common stock during the years 1932 to 1938, *176 inclusive, and paid no preferred dividends from 1933 to 1935, inclusive. For the years 1939 to 1941, it paid common dividends in each year of $45,000 or $20 per share. After 1936 the company paid dividends on the preferred, including the arrearages in 1932. Book value of the common shares in 1941 was about $174.25. Average earnings per common share during the 3-year period 1939 to 1941 was $35.50; during the 6-year period 1936 to 1941, $25.20; and during the 10-year period 1932 to 1941, $16.04. The petitioners reported the common stock at $110 per share and the preferred stock at $105. The parties are agreed as to the preferred shares, but the respondent in his notice of deficiency determined a value of $325 for the common and now contends for a value of $225. The Cherry & Webb Company of Lawrence, had outstanding 1,000 shares of eight per cent cumulative preferred, callable at $105, and 1,210 shares of common stock. In 1941 this company had a total capital of about $296,000, made up of preferred stock at $100,000 and $196,000 in common stock and surplus. Its total capital was about $141,500 in 1932. The ratio of current assets to current liabilities was about 2 2/3 to 1. Sales in *177 1941 amounted to $1,196,000 as compared to total sales of $872,000 in 1940, and total sales of about $517,000 in 1932. Operating income in 1932 amounted to about $6,000 as compared to the gradually increased sum of $64,000 in 1940, and a jump to $143,000 in 1941. Preferred dividend requirements of $8,000 have been met for all years since 1932, although no payments were made in 1934 or 1935. No common stock dividends were paid during the years 1932 to 1938, inclusive. Beginning in 1939, common share dividends averaging about $20,370 annually, or $16.85 per share, have been paid. Book value per common share in 1941 was about $162 without adjustment for possible arrearages in preferred dividends. Average earnings per common share during the 3-year period 1939 to 1941 was $32.20; for the 6-year period 1936 to 1941, it was $22.40; and for the 10-year period 1932 to 1941, it was $18.10. The petitioners reported the preferred stock at $95 and the common shares at $100. In his deficiency notice the respondent determined values of $115 for preferred and $400 for the common. The respondent now advocates values of $105 and $230 for the respective stocks. The Cherry & Webb Company of Lowell, *178 had outstanding 2,000 shares of eight per cent cumulative preferred, callable at $105, and 2,070 shares of common stock. In 1941 it had a total capital of about $319,000, represented by $200,000 preferred and $119,000 in common stock and surplus. It had a total capital of $201,931 in 1932. The ratio of current assets to current liabilities in 1941 was a little less than 3 to 1. Sales in 1941 amounted to about $1,200,000 as compared to $888,000 in 1940 and about $623,000 in 1932. Operating income in 1941 amounted to some $107,000 as compared to the next high of some $47,000 in 1939 and a low of about $9,000 in 1934. The preferred dividend requirements for all years was $16,000 and as of January 31, 1942, there was an arrearage of $152,000, or about $76 per share. No common stock dividends have been paid and amounts available for common stock dividends have been reflected by deficit entries in at least four of the past ten years. In 1941, after adjusting for the arrearage in preferred, the common stock had no book value at all. Treating the preferred shares as the equity stock, the average per share earnings over the 3-year period 1939 to 1941 was $24.37; for the 6-year period ended *179 1941, it was $18.09; and for the 10-year period ended 1941, $13.67. The parties have agreed that the common stock has a nominal value of $5. The petitioners reported the preferred at $98. The respondent determined a value of $150 and now urges us to find that it had a value of $105. The Cherry & Webb Company of Providence, had outstanding 2,250 shares of eight per cent cumulative preferred, callable at $105, and 7,587 shares of common stock. In 1941 it had a total capital of about $1,550,000, represented by $225,000 preferred and $1,300,000 in common shares and surplus. Total capital in 1932 was $1,350,000. The ratio of current assets to current liabilities was more than 6 to 1. Total sales in 1941 were just under $3,000,000 and represented a gradual increase over total sales of $1,633,000 in 1932. Operating income increased from some $90,000 in 1932 to $193,000 in 1939, and to $240,000 in 1941. There was a decrease to $160,000 in 1940. The preferred dividend requirement was $30,000 in 1932 and has been $18,000 since that time, all of which has been paid. Common share dividends were not paid in 1932 or 1933, but have been paid since that time. Book value as of 1941 was about $174 *180 per common share. Average per common share earnings for the 3-year period ended 1941 was $20.85; for the 6-year period ended 1941, $16.06; and for the 10-year period, $10.57. The parties are in agreement that the value of the preferred shares was $105. Petitioners reported the common at $90 per share. The respondent determined a value of $200, and now urges a valuation of $194 per share. The fair market value of each of the securities of the respective store companies as of March 29, 1942, was as follows: Value
Company
Location
Stock
Per Share
Cherry & Co., Inc.
New Bedford
preferred
$105.00
Cherry & Co., Inc.
New Bedford
common
80.00
Cherry & Webb Co.
Fall River
preferred
105.00
Cherry & Webb Co.
Fall River
common
135.00
Cherry & Webb Co.
Lawrence
preferred
105.00
Cherry & Webb Co.
Lawrence
common
131.00
Cherry & Webb Co.
Lowell
preferred
105.00
Cherry & Webb Co.
Lowell
common
5.00
Cherry & Webb Co.
Providence
preferred
105.00
Cherry & Webb Co.
Providence
common
100.00
The Cherry & Webb Realty Company owns store buildings in Fall River, Lawrence, and Lowell which it rents under long-term leases to the Cherry *181 & Webb store corporations at those places. Most of the buildings are old. The income of the Realty Company has been quite stable. The net worth of the company in 1941 was $1,098,903, of which about $528,000 was in land, $320,000 in buildings, $76,000 in cash, and $173,000 was in investments. It had outstanding 11,450 shares having a book value of approximately $96 per share. Its average annual net income over the period 1937 through 1941 has been about $36,155, or about $3.15 per share. Adjusted for excessive salaries and for increased taxes, the average earnings per share amount to about $3.80. The corporation has paid dividends throughout the above period, the average annual dividend paid being about $32,060, or $2.80 per share. The petitioners contend for a valuation of $48 per share and the Commissioner asks for a valuation of $50 per share as determined by him. Cherry Realty Company is similar to the Cherry & Webb Realty Company. It owns only one store building, located at New Bedford. That building is in part a new one. In 1941 the net worth of this company was $418,563, of which about $184,000 was in land and $163,000 in buildings, $36,000 cash, and $35,000 in investments. *182 There were 51 shares of capital stock outstanding with a book value of $8,207 each. The average annual net income over the period 1937 through 1941, without adjustment, was about $7,824, or $153.41 per share. After restoring all salaries except $2,000 per year, annual per share earnings $340of are indicated. The respondent placed a value of $3,936.33 per share on the stock and the petitioners reported it at $3,492.50. The Cherry & Webb Broadcasting Company was organized in 1931 or 1932, but did not develop any earning power to speak of until 1937. It is a small, local station having a 5,000 watt capacity and it is affiliated with the Columbia Broadcasting System. The company had 400 shares of capital stock outstanding, 54 of which were owned by the decedent at his death. It derives its income from the sale of advertising time and services. The per share earnings and dividends for the years 1936 to 1941, were as follows: Year
Earnings
Dividends
1936
$ 8.50
1937
125.90
$100.00
1938
105.90
60.00
1939
197.55
60.00
1940
215.11
90.00
1941
264.99
150.00
Its current assets amounted to some $227,000 as against current liabilities of about $71,000. *183 Book equity per share was $569.26. The fair market value of two realty companies and the broadcasting company shares as of the critical date was as follows: Value
Company
Stock
Per Share
Cherry Realty Co.
capital
$3,936.33
Cherry & Webb Realty Co.
capital
50.00
Cherry & Webb Broadcast-
ing Co.
capital
750.00
In Schedule K, debts of decedent, item 47, of the estate tax return, the petitioners claimed and were allowed a deduction for the sum of $2,500 as a debt owing by the decedent to Dr. Edmund D. Chesebro for services rendered. At the hearing evidence was introduced to the effect that no such sum was owing for medical services rendered. By an amendment to the answer to conform to proof, the respondent has requested that the deduction be disallowed and the amount thereof be restored to the gross estate. In Schedule C, mortgages, notes, and cash, item 8, the petitioners included a mortgage dated October 5, 1933, by Edmund C. Chesebro in the amount of $2,500 and noted that the mortgage had been paid May 8, 1942, without interest. Dr. Chesebro rendered no medical services to the decedent. In January or February 1941, Dr. Chesebro, at the request *184 of the decedent, accompanied him to Florida. The two men had been close friends and Dr. Chesebro had accompanied the decedent on other trips. After the death of decedent the doctor took the view that he was entitled to some remuneration for the time he had spent. Accordingly, the executors offset the mortgage by entering the item in Schedule K. Opinion ARUNDELL, Judge: The first problem is whether the securities transferred by the decedent to his children in 1939 and 1940 were gifts made by him in contemplation of death within the scope of section 811(c), Internal Revenue Code. Since the gifts were made within two years of the decedent's suicidal demise, it is to be deemed, unless the contrary be shown, that such transfers fall within the application of the statute. We have found as a fact that the thought of death was not the impelling cause prompting the decedent to part with the property in question. See United States v. Wells, 283 U.S. 102. The evidence clearly overcomes the presumption and has established to our satisfaction that the decedent was motivated by a desire to assist his children in a financial way and to encourage their interest *185 in some of his numerous business enterprises. The decedent was getting along in years, nearly 72, but he was able and active and, up to the time of his sudden death, he gave every indication that he intended to go on managing his own affairs, holding on to his property and planning for the future. The decedent was a very wealthy man, owning a large number of valuable securities. Had he been thinking in terms of his own death and planning to shift his property to his children in order to lighten the tax burden upon his estate, it seems reasonable to assume that he would have parted with some of his more valuable securities. The East Malartic Gold Mine stock given by him to his daughter had a value of only about $1.15 per share. The Putnam Land & Mills stock had no value at all. The common stock of the Lowell store had but recently been valued for estate tax purposes at the nominal sum of $1 per share. With respect to the Broadcasting Company stock which had considerable value, it appears that the decedent had earlier promised it or given it to his son. After the son had experienced matrimonial difficulties which led to a divorce, the decedent divided the 50 shares equally between his *186 son and daughter, hoping to keep it in the family and to give his children equal voting rights. The Rosedale Realty bonds represented cash that the decedent had advanced to the Realty Company at different times and it appears that they were worth their aggregate face value of $400,000. The evidence indicates that the decedent deliberated over this gift for some time. He had found it advisable or even necessary from time to time to furnish his children with money to meet their current needs and he finally decided to turn these bonds over to them. He was not motivated in so doing by his likelihood of death and the avoidance of estate taxes, but rather by a desire to assist his children at that time and possibly to let them carry the income tax load on money that he would probably have given them anyway in the course of a few years' time. Accordingly, we hold that the values of the gifts in question are not includible in decedent's gross estate. We have set forth in our findings data with respect to the various companies whose securities are before us for valuation and have indicated our conclusion as to their respective fair market values as of the critical date. No good purpose can *187 be served by here attempting to set forth in detail all of the relevant circumstances and factors upon which the different values were predicated. Suffice it to say we considered all aspects and factors entering into such a determination. As to the preferred stocks of all of the store companies, we have set the value at the call price of $105 per share. Some of the companies were in better circumstances than others. However, since all of these stocks were callable at any time at the figure indicated and because we have concluded that each of the preferred shares by a sale at arm's length and without any compulsion whatsoever would bring that price, we have placed the value accordingly. At the hearing the respondent offered no evidence in support of greater value and on brief he urges no finding of any greater values for any of the preferred shares. With respect to two of the companies, the petitioners reported the value at $105. The other three were reported at prices ranging from $94 to $98. The parties have agreed that the common shares of the Lowell store had a nominal value of about $5 per share. We have found nothing which would warrant any change therein and, accordingly, have *188 approved that valuation. The valuation of the parties as to the common stocks of the four remaining store companies were far apart. To a very great extent the difference was due to the period selected for the ascertainment of the average earnings and to the rates of capitalization to be applied. The respondent has taken the average earnings for the most recent years, either three or five years ending in 1941 and in some cases 1942, which was a period of exceptionally high earnings for each of the companies and could hardly be said to reflect an average based on the company history. He also advocates a general capitalization rate of 10 per cent for application here. The petitioners produced as an expert witness Mr. Chelcie C. Bosland who has appeared as a witness in this Court on several occasions. Much statistical data with respect to each of the companies here involved and with respect to other companies used as comparatives were introduced through this witness. Bosland found the average per share earnings of the instant companies for 3, 6 and 10-year periods ending in 1941 and capitalized them at rates applicable to comparable companies whose stocks were traded in and averaged *189 his results. As of the critical date Bosland found that the market prices for common stocks of comparable stores averaged 4.76 times average earnings (or a ratio of earnings to price of.2101) for the 3-year period ended 1941, 4.84 times (or a ratio of earnings to price of.2066) for the 6-year period ended 1941, and 5.63 times (or a ratio of earnings to price of.1776) for the 10-year period ended 1941. He made certain adjustments which he thought necessary in each instance to adapt properly the values of the instant stocks. We withhold comment as to the propriety of all the adjustments so advocated. We are inclined to think that a computation of that kind in the instant case should be predicated more upon a result to be achieved through the application of the rate applicable to the comparable companies for the 3 and 6-year periods. The introduction of factors based on earnings as far back as 10 years, or 1932, seems to us to introduce elements which are too remote to be of real assistance in determining the issue. However, we have not relied on any single factor, method or approach but have considered the problem in the light of all relevant factors and circumstances and have concluded, *190 as set out in our findings, that the fair market value of the common stocks at the critical date was: New Bedford, $80; Fall River, $135; Lawrence, $131, and Providence, $100 per share. The realty companies present a somewhat different problem. As to the Cherry & Webb Realty Company, the experts of the respective parties were but a dollar or two apart on their appraisals. In the light of all the evidence, we think the respondent's determination of $50 per share is supported and should not be disturbed. As to the Cherry Realty Company, the respondent, in arriving at his value, added to earnings all but $2,000 in salaries paid by the corporation, thereby increasing earnings by about $9,500 per year. The resulting 5-year average annual income was some $17,374, the equivalent of about 8 1/2 per cent on $4,000 per share. This company owned a single store property and had a net worth of about $418,000. About $347,000 was in land and buildings and some $71,000 in cash and securities. The building was rented to the Cherry & Webb store at New Bedford. Book value per share was more than $8,000. Under the circumstances here present, we think a per share value of $3,936.33, as determined by *191 the respondent, is warranted, and, accordingly, we sustain that value. The Broadcasting Company shares are somewhat more difficult to evaluate. In support of their value of $700 per share the petitioners urge that we capitalize the average earnings of the instant company for a 3 and a 6-year period ended in 1941, at rates applicable to the stock of the Columbia Broadcasting Company and Station in WJR in Detroit, whose stocks were traded in at the critical date. So computed a value of $729 per share is reflected. Because of differences in the relative position of the companies, the petitioners urge us to find a value of $700. In his deficiency notice the respondent determined a value of $750. The higher value of $1,000 sought by the respondent by way of amended answer is obtained by capitalizing 5-year average earnings at 18 per cent. We are not certain that the above radio stations whose stocks were on the market may, with satisfaction, be used as comparatives to the instant station. The petitioners concede that they are not close comparables. Whether the stocks of other radio stations more closely akin to the Webb Broadcasting Company were traded in at or close to the critical *192 date is uncertain. Neither the respondent nor the petitioners have offered any evidence with respect thereto. In view of the success of the instant station during the past five years, in view of its capital position and structure as of the valuation date, and in the light of all other factors, we have concluded that the value of the stock was $750 per share as originally determined by the respondent. The record affords no justification for the higher value requested by the respondent in his amended answer. There remains only the question of whether the claimed debt of $2,500 to Dr. Edmund C. Chesebro was a proper deduction or whether a deduction for that sum should be disallowed. The situation is a little unusual and the real consideration is whether decedent was actually indebted to the doctor. There is no question but that the decedent owned a mortgage given him by the doctor. The executors reported the mortgage as property of the decedent although they offset it by honoring a claim in the same amount. There is no contention that the claim was for "medical services" and the testimony is only to the effect that no money was owing by the decedent to the doctor for such services. *193 The evidence is uncontroverted that Dr. Chesebro accompanied the decedent to Florida in 1941 at the request of the decedent. Also, that he had made other trips with him at decedent's request. There is no indication whatsoever as to the financial arrangements between the two men. We do not feel at liberty to assume that Dr. Chesebro's time was gratuitously given, in the light of the fact that he has claimed as compensation the sum in question. The respondent has the burden of providing us with reasonable grounds for upholding his position and this he has failed to do. Accordingly, the claim as allowed by the respondent must stand. The parties have stipulated that proper allowable increases in administration and attorneys' fees occasioned by this proceeding will be taken into account in the recomputation. It is so ordered. Decision will be entered under Rule 50.